IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| HOOMAN HAJIAN, | |
| Plaintiff, | Cause No. 4:26-CV1886 |
| v. | Div. |
| PHARMA MEDICA RESEARCH, INC., | **JURY TRIAL DEMANDED** |
| MOHAMED YAMLAHI, | |
| LATIFA YAMLAHI, | |
| MOHAMMED BOUHAJIB, | |
| ARMANDO DESOUSA, | |
| MARY STIPANCIC | |
| and | |
| MIKE PANAYI | |
| Defendants. | |

## COMPLAINT

COMES NOW Plaintiff Hooman Hajian (hereinafter "Plaintiff"), by and through his attorneys, O'Brien Law Firm, P.C., and for his Complaint, states:

## PRELIMINARY STATEMENT

1. Defendant Pharma Medica Research Inc. (hereinafter "PMRI") employed Plaintiff for approximately 14 months. During this time, Plaintiff developed significant concerns over illegal and unethical activities that PMRI was actively

engaged in, particularly as related to screenings being conducted on American citizens for studies being conducted in Canada. After voicing these concerns to his employer and seeing them summarily dismissed, Plaintiff sought employment elsewhere. Meanwhile, Defendants surreptitiously and unlawfully accessed Plaintiff's personal email account, regularly reading communications between Plaintiff and potential employers, attorneys, and even his wife. Despite Plaintiff's concerns about PMRI's unlawful and unethical conduct, Defendant PMRI needed Plaintiff to continue in his role as Principal Investigator for its site in St. Charles, Missouri, so that it could avoid a mandatory shutdown as federal regulations would require in the absence of a qualified Principal Investigator. To this end, PMRI interfered with an employment contract that Plaintiff had signed with Luitpold Pharma, preventing him from moving on with his career, and effectively trapping him at PMRI. Shortly thereafter, PMRI fired Plaintiff after Defendants unlawfully discovered from Plaintiff's emails that he had reported PMRI to the United States Food and Drug Administration (hereinafter "FDA") for the concerns that Defendants had earlier dismissed.

2. Though these events occurred between January 2014 and March 2015, the secret and surreptitious nature by which Defendants accessed and unlawfully viewed his emails prevented Plaintiff from becoming aware of Defendants' actions until he received a mailing bearing a return address that matched PMRI's address in Ontario, Canada, in September 2025. This mailing contained printouts of emails showing Defendants had forwarded the contents of Plaintiff's personal email

account (including messages about his job-seeking and whistleblowing to the FDA) between each other. The anonymous mailing also contained a printed page bearing the following words in oversized type: "You were screwed. Now you know. A Friend." *See* Envelope and Message, attached hereto as Exhibit 1.

3. Plaintiff brings this action, among other statutes and common law remedies, pursuant to 18 U.S.C. § 2707, seeking statutory damages, punitive damages, attorney's fees, and costs of litigation against all Defendants for violation of the Stored Communications Act.

**JURISDICTION AND VENUE**

4. Jurisdiction of the Court is properly invoked pursuant to federal question jurisdiction under 28 U.S.C. § 1331 and diversity jurisdiction under 28 U.S.C. § 1332 as well as the aforementioned 18 U.S.C. § 2707.

5. Plaintiff's claim for attorney's fees and costs is authorized by 18 U.S.C. § 2707.

6. Venue is proper pursuant to 28 U.S.C. §1391(b)(2). All actions alleged herein occurred in St. Charles, Missouri, which is located in the Eastern District of Missouri.

7. Though the events described below transpired in 2014 and 2015, Plaintiff only learned of Defendants' tortious conduct in September 2025, after he received an anonymous letter in the mail attaching printed copies of emails demonstrating that Defendants had unlawfully and surreptitiously accessed his email account hhajian@gmail.com (as discussed below), and had used what they found to harm

him. *See* Ex. 1.

8. Because Plaintiff was never made aware of Defendants accessing his emails, he could not have discovered (and did not discover) their tortious actions until September 2025. *Id.*

9. Prior to receiving the anonymous letter in September 2025, Plaintiff could not have discovered, even through the exercise of reasonable diligence, that Defendants had secretly accessed his personal email account, reviewed his private emails, and disseminated the contents of his private emails.

10. Defendants intentionally concealed their conduct from Plaintiff.

11. Accordingly, pursuant to the discovery rule, each one of Plaintiff's causes of action first accrued in September 2025.

## PARTIES

12. Plaintiff is a naturalized citizen of the United States and resident of the State of Washington.

13. At the time of most of the events described below, he resided in Missouri and was lawfully in the United States working under an H-1B Visa.

14. Defendant PMRI is a company based in Canada, with its primary place of operations at 6100 Belgrave Road, Mississauga, Ontario.

15. At the time of the events complained of below, Defendant PMRI's primary business was in operating facilities for conducting screenings and tests on behalf of sponsors who were developing generic pharmaceutical drugs.

16. At the time of the events complained of below, Defendant PMRI

maintained a clinical trial site in St. Charles, Missouri, at 400 Fountain Lakes Blvd, St Charles, MO, 63301 (hereinafter "the St. Charles Site").

17. Defendant Mohamed Yamlahi (hereinafter also "M. Yamlahi") is a citizen of Canada.

18. At the time of the events described below, Defendant M. Yamlahi was employed by PMRI and held the position of Vice President of Information Technology.

19. Defendant M. Yamlahi is sued in his individual and official capacities.

20. Defendant Latifa Yamlahi (hereinafter "L. Yamlahi") is a citizen of Canada.

21. At the time of the events described below, Defendant L. Yamlahi was employed by PMRI and held the position of Chief Executive Officer and President. She was also a partial owner of PMRI.

22. Defendant L. Yamlahi is sued in her individual and official capacities.

23. Defendant Mohamed Bouhajib (hereinafter "Bouhajib") is a citizen of Canada.

24. At the time of the events described below, Defendant Bouhajib was employed by PMRI and held the position of Vice President of Bioanalytical Operations. He was also a partial owner of PMRI.

25. Defendant Bouhajib is sued in his individual and official capacities.

26. Defendant Armando DeSousa (hereinafter "DeSousa") is a citizen of Canada.

27. At the time of the events described below, Defendant DeSousa was employed by PMRI and held the position of Chief Financial Officer.

28. Defendant DeSousa is sued in his individual and official capacities.

29. Defendant Mary Stipancic (hereinafter also "Stipancic") is a citizen of Canada.

30. At the time of the events described below, Defendant Stipancic was employed by PMRI and held the position of Chief Privacy Officer and Vice President of Quality.

31. Defendant Stipancic is sued in her individual and official capacities.

32. Defendant Mike Panayi is a citizen of Canada.

33. At the time of the events described below, Defendant Mike Panayi (hereinafter "Panayi") was a partial owner of PMRI.

34. Defendant Panayi is sued in his individual and official capacities.

## FACTS

### Plaintiff's Concerns, PMRI's Disregard, and Plaintiff's Whistleblowing

35. In or around January 2014, Plaintiff was hired by PMRI as the Principal Investigator and Medical Director for the St. Charles Site.

36. Pursuant to federal regulations (including, but not limited to, 21 C.F.R. § 312.23), Defendant PMRI was legally required to have a Principal Investigator at the St. Charles Site to lawfully conduct clinical studies there.

37. As Principal Investigator, Plaintiff's duties included ensuring the safety of trial participants and ensuring that clinical trials were conducted safely and

ethically.

38. By November 2014, Plaintiff began to have concerns regarding PMRI's use of the St. Charles Site as a "satellite" screening and recruiting location for studies conducted in Canada regarding the development of generic drugs (hereinafter also "the Studies").

39. Among other issues, Plaintiff had concerns about:

a. PMRI's refusal to inform a United States Institutional Review Board (hereinafter "IRB") about the use of the St. Charles Site in connection with the Studies, despite having a legal obligation to do so;

b. PMRI's false characterization of screenings conducted specifically for the Studies as "general screenings" despite containing tests not associated with "general screenings" (e.g., lipid panels, stress tests);

c. PMRI creating and issuing advertisements aimed at recruiting study participants in the United States, including offering payment of $6,700, despite not having the legally required approval of an IRB;

d. PMRI conducting screening on American subjects using consent forms generated in Canada without regard to American laws and regulations;

e. PMRI having the lab results of American subjects reviewed by its staff in Canada without first having obtained the consent of said subjects;

f. PMRI becoming aware of test results in American subjects indicative of potential health concerns without making said subjects aware of risks to their health or even recommending that they follow up with a

physician or other medical provider;

g. PMRI conducting screening for the Studies using test ranges for inclusion and exclusion expressed in Canadian units; and

h. The sponsors of PMRI's Studies being unaware of any of the above, and therefore unwittingly being subjected to risk in the event that the illegalities and improprieties connected with the Studies were discovered by regulators in the Canada and/or the United States.

40. Plaintiff first communicated his concerns regarding the lack of IRB approval to PMRI employee Shabaz Khan (hereinafter "Khan") in or around November 2014.

41. Khan advised Plaintiff that Defendant L. Yamlahi had decided that obtaining IRB approval would be too onerous and time-consuming, and that it would be faster to simply start screening and recruiting American subjects immediately.

42. Over the course of the next several months, Plaintiff attempted to distance himself from the Studies.

43. Nonetheless, due to his role as Principal Investigator, Plaintiff was unable to avoid all contact with the Studies, and, over time, became more concerned about the issues identified in paragraph 39.

44. On February 5, 2015, Plaintiff shared his concerns with Dr. C.T. Viswanathan (hereinafter "Dr. Viswanathan"), an external consultant to PMRI regarding preparedness for potential audits from the FDA's Center for Drug

Evaluation and Research.

45. Dr. Viswanathan requested a telephone conference with PMRI regarding the concerns Plaintiff raised on the same day, which he attended along with Plaintiff, Khan, Defendant Stipancic and PMRI employee Aatir Butt (hereinafter "Butt").

46. At this conference, Defendant Stipancic, Khan, and Butt confessed that PMRI had not even fully informed a Canadian Research Ethics Board[1] regarding its use of the St. Charles Site as a screening and recruiting center for the Studies, much less an American IRB.

47. Indeed, Stipancic, Khan, and Butt revealed that, to the extent that PMRI's actions at the St. Charles Site as related to the Studies had been raised with an IRB at all, it was only by way of a casual question over the phone about using databases of American companies to recruit subjects. It was further revealed that Defendant L. Yamlani was responsible for the decision not to make a full disclosure.

48. Defendant L. Yamlani herself later joined the conference and proceeded to verbally berate Plaintiff and Dr. Viswanathan, deny knowing that PMRI had an obligation to inform an American IRB of what was transpiring, and accuse Plaintiff and Dr. Viswanathan of having "secret agendas."

49. Following this meeting, having observed PMRI's refusal to make the appropriate disclosures even when confronted by an external consultant (Dr.

[1] This is the Canadian equivalent of an American Institutional Review Board.

Viswanathan), and concerned about the harm that could result from PMRI's actions, Plaintiff became convinced that he would need to report PMRI to the FDA.

50. On February 23, 2015, Plaintiff reached out to the FDA regarding his concerns about PMRI's actions as described above.

51. On February 24, 2015, Plaintiff spoke with Catherine Parker at the FDA, articulating the concerns described in paragraph 39 above.

52. On February 25, 2015, Plaintiff followed up with Ms. Parker via email, adding to what he had disclosed the prior day.

53. Plaintiff's last contact with the FDA regarding PMRI was on March 19, 2015.

**Plaintiff's Termination**

54. On March 20, 2015, just over a year after being hired, four months after first voicing his concerns about PMRI's actions in regard to The Study, less than one month after sharing his concerns with the FDA, and a mere five days after Defendants circulated Plaintiff's communications with the FDA (as described below) PMRI terminated Plaintiff's employment.

55. When Plaintiff inquired as to why he was being terminated, he was told that PMRI had "significant concerns about his loyalty," that he had displayed a "lack of loyalty," and that "the performance of his duties continuing [was] not in the best interests" of PMRI.

56. When Plaintiff inquired about why his termination papers did not reflect

this stated reason, he was simply told that they did not "have to."

57. When Plaintiff inquired about what was meant by a "lack of loyalty", he was told that the conversation was over.

58. Plaintiff was then escorted out of PMRI's premises without further explanation.

59. At no point during Plaintiff's termination was he informed that PMRI had accessed his emails (see below) or that it was aware he had communicated with the FDA regarding his concerns over PMRI's actions as related to the Studies.

**Defendants' Accessing and Sharing of Plaintiff's Personal Emails**

60. Prior to being terminated, in or around November 2014, after becoming concerned about PMRI's actions, Plaintiff began seeking employment with other companies.

61. One such company was Apogee Physicians (hereinafter also "Apogee").

62. Another was Luitpold Pharma (hereinafter also "Luitpold").

63. Sometime between November 2014 and February 2015, Defendants, acting in concert with one another, gained access to Plaintiff's personal email account, hhajian@gmail.com, and began reviewing its contents.

64. Defendants did so by accessing passwords that had been stored in Plaintiff's internet browser.

65. Defendants never informed Plaintiff that they had accessed his personal email account.

66. Instead, they continued to secretly access it whenever they pleased. They

started doing so no later than February 4, 2015, and continued until at least March 22, 2015.

67. On February 4, 2015, via email, Defendant M. Yamlahi forwarded private employment negotiations between Plaintiff and Brittany Kirking at Apogee Physicians to Defendants Stipancic, L. Yamlahi, and DeSousa. *See* February 4, 2015, email from M. Yamlahi, attached hereto as Exhibit 2.

68. Defendant M. Yamlahi stated in the email that he was "working on pulling the document" (referring to an employment contract) but that Plaintiff had still not yet signed it. *Id.*

69. On February 5, 2015, Defendant Stipancic emailed Defendants DeSousa, L. Yamlahi, and M. Yamlahi using the subject heading "Hooman," and in a message marked as being of "high" importance, stated "Hooman signed the contract this morning. Expect the resignation soon." *See* February 5, 2015, email from M. Stipancic, attached hereto as Exhibit 3.

70. By February 7, 2015, Plaintiff had signed an employment contract with Luitpold Pharma.

71. On February 9, 2015, Defendant Stipancic again emailed Defendant L. Yamlahi, under the subject heading "please read-very important," this time forwarding an email that Plaintiff had sent to himself containing an account of what had transpired in the Studies and memorializing his concerns about it. *See* February 9, 2015, email from M. Stipancic and attached summary authored by Plaintiff, collectively attached hereto as Exhibit 4.

72. Defendant Stipancic referred to Plaintiff's message to himself and the accounting of his concerns as a "dangerous email." *Id.*

73. On February 10, 2015, Defendant Stipancic again emailed Defendants DeSousa, L. Yamlahi, and M. Yamlahi using the subject line "Hooman," this time reporting that Plaintiff would be starting with Apogee Physicians on March 27, 2015, and that he had accepted another position with Luitpold. *See* February 10, 2015, email from M. Stipancic, attached hereto as Exhibit 5.

74. On February 24, 2015, Defendant Stipancic forwarded to Defendants DeSousa, L. Yamlahi, and Bouhajib an email from Plaintiff to Susan Gorog at Apogee Physicians regarding his H-1B immigration status. In it, Plaintiff stated that he would need to obtain new employment before it could be properly updated, allowing him to remain in the United States. *See* February 24, 2015, email from M. Stipancic, attached hereto as Exhibit 6.

75. Defendant L. Yamlahi responded to Defendant Stipancic's email by stating, also via email, "This guy doesn't deserve to be a doctor or even an American citizen." *See* February 24, 2015, email from L. Yamlahi, attached hereto as Exhibit 7.

76. Defendant DeSousa responded by stating via email, "Oh boy! If you can get the [replacement Principal Investigator] sooner that will really complicate his situation. What a dummy! 😊." *See* February 24, 2015, email from A. DeSousa, attached hereto as Exhibit 8.

77. On February 25, 2015, Defendant Stipancic emailed Defendants L.

Yamlahi, DeSousa, and Bouhajib a copy of an email between Plaintiff and David Bloomfield, who acted as immigration counsel for Luitpold Pharma, regarding Plaintiff's immigration status. *See* February 25, 2015, email from M. Stipancic, attached hereto as Exhibit 9.

78. Nonetheless, after Defendants discovered that Plaintiff, PMRI's Principal Investigator required for continued operation of the St. Charles site, for whom no replacement had yet been found, had signed a contract with another employer, Luitpold Pharma suddenly and inexplicably decided not to hire him.

79. Luitpold Pharma informed Plaintiff of this decision on February 25, 2015.

80. An agent of Defendant PMRI reached out to Luitpold Pharma and convinced them not to hire Plaintiff.

81. On February 26, 2015, Defendant Stipancic emailed Defendant L. Yamlahi, using the subject line "email Hooman sent someone from an IRB today," cutting and pasting a letter from Plaintiff to Martin Letendre (executive director of a Canadian Research Ethics Board) laying out concerns about (among other things) PMRI's failure to obtain proper consent from test subjects and to advise them of potential health concerns indicated by their test results. *See* February 26, 2015, email from M. Stipancic, attached hereto as Exhibit 10.

82. On February 28, 2015, Defendant Panayi emailed Defendant L. Yamlahi requesting that she check Plaintiff's personal email account to see if there were any messages between Plaintiff and a potential replacement Principal Investigator with whom PMRI had been communicating but had not yet hired. *See* February

24, 2015, email from M. Panayi, attached hereto as Exhibit 11.

83. On March 15, 2015, when Plaintiff was on vacation and therefore not on PMRI's premises or using its computers, Defendant M. Yamlahi emailed Defendants L. Yamlahi and Bouhajib several times, attaching emails from Plaintiff to the FDA regarding safety concerns at PMRI, and copying Plaintiff's account of a conversation with Ms. Parker on February 24, 2015. *See* March 15, 2015, email from A. DeSousa, attached hereto as Exhibit 12.

84. Most of the emails Defendants surreptitiously accessed had been sent and received while Plaintiff was away from PMRI's premises, using Plaintiff's personally owned electronic devices and his personal internet connection during non-work hours.

85. On March 22, 2015, two days *after* PMRI terminated Plaintiff, Defendant M. Yamlahi accessed Plaintiff's personal email account once again, forwarding attorney-client privileged communications between Plaintiff and his immigration attorney to Defendant L. Yamlahi. *See* March 22, 2015, email from M. Yamlahi, attached hereto as Exhibit 13.

**Connecting the Dots**

86. Defendants had known that Plaintiff had concerns regarding PMRI's actions in The Study since November 2014.

87. Defendants were aware that they could not lawfully operate the St. Charles Site without a Principal Investigator.

88. Due to illegally accessing Plaintiff's emails, Defendants knew that Plaintiff was seeking other employment by February 4, 2015, if not before then.

89. Defendants knew about the full scope of Plaintiff's concerns about PMRI's unlawful and unethical actions by February 5, 2015, if not before then.

90. Due to illegally accessing Plaintiff's emails, Defendants knew that Plaintiff was close to finalizing an employment agreement with Luitpold Pharma by February 10, 2015, if not before then.

91. Due to illegally accessing Plaintiff's emails (if for no other reason), Defendants knew that Plaintiff would need continuity of employment in order to safeguard his H-1B Visa.

92. Realizing that PMRI could not afford to lose Plaintiff before they had hired a replacement as Principal Investigator, Defendants reached out to Luitpold Pharma and convinced it not to hire Plaintiff.

93. It was only after Defendants learned that Plaintiff had communicated his concerns to the FDA on or around March 15, 2015, and after PMRI had hired a replacement Principal Investigator, that Defendants terminated Plaintiff a mere five days later on March 20, 2015.

94. Defendant PMRI's termination of Plaintiff was done in direct response to learning that Plaintiff had communicated his concerns to the FDA.

95. Defendants continued to monitor Plaintiff's immigration status following his termination out of fear that he would continue to work with the FDA regarding the concerns he had raised.

96. As a result of Defendant PMRI's interference with Plaintiff's contract with

Luitpold Pharma, Plaintiff was deprived of the opportunity to earn $357,000 per year, plus a $30,000 signing bonus.

97. Following Defendant PMRI's interference with the Luitpold Pharma contract and later termination of Plaintiff as described above, Plaintiff was unable to obtain permanent and steady employment in his field until October 2015.

98. When he did so, it was at a pay rate of $268,000 per year, with only a $15,000 signing bonus.

99. Accordingly, Plaintiff's earnings over the course of his career have been reduced by no fewer than $905,000, and likely far more.

100. In addition to lost wages, lost employment and economic opportunity, and diminished career trajectory, Defendants' actions against Plaintiff have caused him to suffer depression, anxiety, mental anguish, and other forms of emotional suffering.

## COUNT I – VIOLATION OF THE STORED COMMUNICATIONS ACT (AGAINST ALL DEFENDANTS)

101. Plaintiff incorporates and adopts by reference each and every allegation set forth in paragraphs 1 through 100 above as fully set forth herein.

102. Defendants, at all relevant times, were acting in the scope and course of their employment by PMRI.

103. 18 USC § 2707 establishes civil liability for any violations of Title 18, Chapter 121 of the United States Code.

104. 18 USC § 2701 prohibits intentionally accessing "without authorization a facility through which an electronic communication service is provided" and thereby obtaining access to electronic communications.

105. Federal courts have held that the term "facility" as used in 18 USC § 2701 includes "any service which provides users thereof the ability to send or receive wire or electronic communications." *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1178 (11th Cir. 2017), *citing* 18 U.S.C. § 2510(15). *See also Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 555–56 (S.D.N.Y. 2008) (finding a violation of the Stored Communications Act where an employer accessed an employee's email account.)

106. Plaintiff's email account provides this ability and is therefore a "facility" as defined by 18 USC § 2701.

107. Defendants accessed Plaintiff's email account without his authorization, and thereby obtained access to his electronic communications numerous times.

108. Pursuant to 18 U.S.C. § 2707(f), a civil action for violation of the Stored Communications Act may be commenced up to "two years after the date upon which the claimant first discovered or had a reasonable opportunity to discover the violation." 18 U.S.C. § 2707(f).

109. Prior to his receipt of the anonymous letter of September 2025, Plaintiff had no reasonable opportunity to discover Defendants' violations of 18 U.S.C. § 2701.

110. 18 USC § 2707 authorizes the recovery of any profits made by violating the Act (in no event less than $1,000), as well as punitive damages, costs, and

reasonable attorney's fees if the violation is willful or intentional.

111. Defendants each profited from Defendant PMRI's continued operation of the St. Charles Site after preventing Plaintiff from leaving PMRI for employment at Luitpold Pharma during the period of February 25, 2015 (at the latest), through March 20, 2015 (at the earliest).

112. Defendants' acts were committed willfully, intentionally, and with malice or reckless disregard for the rights of Plaintiff, justifying the imposition of punitive damages and the recovery of attorney's fees.

WHEREFORE, Plaintiff prays for a Judgment against Defendants, jointly and severally, for all profits resulting from Defendants' many violations of the Act in an amount to be determined at trial, punitive damages against all defendants in an amount to be determined at trial, attorney's fees, costs, and such other and further relief as this Court deems just and proper.

**COUNT II – WRONGFUL DISCHARGE**
**(AGAINST DEFENDANT PMRI)**

113. Plaintiff incorporates and adopts by reference each and every allegation set forth in paragraphs 1 through 100 above as fully set forth herein.

114. While employed by PMRI, Plaintiff reported to the FDA, a governmental agency, which was the proper authority, PMRI's unlawful actions as described above.

115. The conduct of PMRI that Plaintiff reported to the FDA violated regulations, including 21 C.F.R. §§ 312.23, 312.30, 312.53, 312.66, and 312.70

(among others) which require that companies like PMRI keep an IRB informed of and involved with its actions in connection with clinical investigations like those associated with the Studies.

116. Plaintiff reporting PMRI's actions to the FDA was a substantial factor in PMRI's decision to terminate his employment.

117. At the time of these events, Missouri law provided no specific statutory remedy to protect Plaintiff from PMRI's wrongful discharge of him.

118. Defendant PMRI's wrongful discharge of Plaintiff has caused him to suffer lost wages, lost employment and economic opportunity, and diminished career trajectory. Defendant's actions against Plaintiff have further caused him to suffer depression, anxiety, mental anguish, and other forms of emotional suffering.

119. PMRI's actions in not only unlawfully accessing Plaintiff's personal email account, but also in preventing his hiring by Luitpold Pharma and then terminating him were outrageous and displayed a reckless indifference to Plaintiff's rights, justifying the imposition of punitive damages, in addition to awarding his attorney's fees.

WHEREFORE, Plaintiff prays for a Judgment against Defendant PMRI for compensatory damages in an amount to be determined at trial, punitive damages in an amount to be determined at trial, costs, and such other and further relief as this Court deems just and proper.

## COUNT III – INVASION OF PRIVACY VIA UNREASONABLE INTRUSION UPON SECLUSION (AGAINST ALL DEFENDANTS)

120. Plaintiff incorporates and adopts by reference each and every allegation set forth in paragraphs 1 through 100 above as fully set forth herein.

121. Defendants publicized to and amongst each other matters concerning Plaintiff's personal life, including communications with his wife and attorney-client privileged communications with his attorneys.

122. Publication of one's private communications with one's spouse and/or one's attorneys would be highly offensive to a reasonable person of ordinary sensibilities.

123. None of Plaintiff's communications with his wife or attorneys were of legitimate public concern.

124. Defendants' invasions of Plaintiff's privacy have caused Plaintiff to suffer depression, anxiety, mental anguish, and other forms of emotional suffering.

125. Defendants' actions in unlawfully accessing Plaintiff's personal emails and then forwarding them to each other were outrageous and displayed a reckless indifference to Plaintiff's rights, justifying the recovery of punitive damages.

WHEREFORE, Plaintiff prays for a Judgment against Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, punitive damages against all defendants in an amount to be determined at trial, costs, and such other and further relief as this Court deems just and proper.

**COUNT IV – TORTIOUS INTERFERENCE WITH A BUSINESS INTEREST (AGAINST DEFENDANT PMRI)**

126. Plaintiff incorporates and adopts by reference each and every allegation set forth in paragraphs 1 through 100 above as fully set forth herein.

127. Plaintiff had a valid contract for employment with Luitpold Pharma as described above.

128. Defendant PMRI became aware of this contract by unlawfully accessing his private emails.

129. Defendant PMRI and/or agents acting on its behalf reached out to Luitpold Pharma and convinced it not to hire Plaintiff, so that Plaintiff would be forced to continue to serve as Principal Investigator for Defendant PMRI, which could then continue to run studies at its St. Charles Site.

130. Plaintiff had no reason to believe PMRI had communicated with Luitpold Pharma until learning from the contents of the anonymous letter in September 2025 that PMRI had been unlawfully accessing his private emails.

131. Defendant PMRI was unjustified in interfering with Plaintiff's lawful attempt to seek employment elsewhere, particularly since it terminated him approximately one month later.

132. As a result of Defendant PMRI's interference with Plaintiff's contract with Luitpold Pharma, Plaintiff was denied the opportunity to earn $357,000 per year, plus a $30,000 signing bonus.

133. Following Defendant PMRI's interference with the Luitpold Pharma

contract and its later termination of Plaintiff as described above, Plaintiff was unable to obtain employment until October 2015.

134. When Plaintiff eventually obtained employment, it was at a pay rate of $268,000 per year, with only a $15,000 signing bonus.

135. Accordingly, Plaintiff's earnings over the course of his career have been reduced by at least $905,000.

136. Defendants' actions in unlawfully accessing Plaintiff's personal emails to discover the Luitpold Pharma contract and then reaching out to Luitpold to ensure that it did not hire Plaintiff, simply to ensure that it could continue to run unlawful screenings at the St. Charles Site, displayed a reckless indifference to Plaintiff's rights, justifying the recovery of punitive damages.

WHEREFORE, Plaintiff prays for a Judgment against Defendant PMRI for compensatory damages in an amount to be determined at trial, punitive damages in an amount to be determined at trial and such other and further relief as this Court deems just and proper.

Respectfully Submitted,

**O'BRIEN LAW FIRM, PC**

BY: /S/ *Luke A. Baumstark*
Grant C. Boyd #67362
Luke A. Baumstark #56344
Joeseph T. Wilson #67917
135 W. Adams Ave, Suite 200
St. Louis, MO 63104
(314) 588-0558
(314) 588-0634 FAX
boyd@obrienlawfirm.com
lbaumstark@obrienlawfirm.com
jwilson@obrienlawfirm.com